<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ESTATE OF FRANK P. LAGANO,<br><br>   *Plaintiff*,<br><br>   v.<br><br>BERGEN COUNTY PROSECUTOR'S OFFICE;<br>MICHAEL MORDAGA; and various JOHN<br>DOE defendants whose individual identities or<br>wrongful acts are not now known to Plaintiff,<br><br>   *Defendants*. | Civil No.: 12-cv-5441 (KSH) (CLW)<br><br><br><br><u>**OPINION**</u> |

<u>**Katharine S. Hayden, U.S.D.J.**</u>

**I.      Introduction**

This action arises from the unsolved murder of Frank P. Lagano, who was fatally shot in the parking lot of an East Brunswick diner on April 12, 2007. His estate claims that defendant Michael Mordaga, former Chief of Detectives for defendant Bergen County Prosecutor's Office (the "BCPO," together with Mordaga, "defendants"), disclosed Lagano's confidential informant status to members of organized crime, which led to his death.

In August 2012, the Estate filed suit under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act, N.J.S.A. 10:6-1, *et seq.* ("NJCRA") alleging that defendants' alleged disclosure constituted a state-created danger in violation of Lagano's due process rights. Now, more than a decade later, defendants move for summary judgment (D.E. 499, 502) arguing that the Estate has failed to uncover any competent evidence to support its claims. The motions are fully briefed, and the Court decides them without oral argument pursuant to L. Civ. R. 78.1.

## II.     Factual Background

The summary judgment record before the Court consists of 80 exhibits, the parties'
statements and counterstatements of material facts, and a lengthy final pre-trial order.[1]
Notwithstanding, the issue on the defendants' motions is a narrow one:  is there evidence
sufficient for a jury to determine that the BCPO and/or its Chief of Detectives Michael Mordaga
disclosed Frank Lagano's confidential informant status to members of organized crime, and that
this disclosure led to his execution?

Defendants challenge the quantum of evidence the Estate has produced to support its
current claim, which is that before he was murdered, Lagano (who himself was a member of the
Lucchese organized crime family) was having dinner at a restaurant with two men associated
with organized crime when Mordaga approached their table and disclosed that Lagano was an
informant for the New Jersey Division of Criminal Justice ("DCJ").  According to defendants,
the only evidence of this encounter and the revelation is a single memorandum, a writing that
they argue is inadmissible and of little probative value.  In opposition, the Estate concedes that
the memorandum is essential to its case, but argues that it has nonetheless satisfied its burden of
presenting a genuine issue for trial.

### A.  Origins of the Sweeney Memorandum

The contested document is an internal DCJ memo purportedly written by the late James
Sweeney, then an investigator for the DCJ, to his superior Paul Morris.  (D.E. 507-6, Sweeney
Memo at 1.)  Dated May 11, 2007 with the subject line "Langano Homicide" (Sweeney misspells
Lagano's surname throughout), the memorandum purports to relay "intelligence data" regarding

---

[1] The Court is no stranger to this case, having issued an opinion on November 23, 2021 affirming
two of Magistrate Judge Waldor's discovery orders.  (*See* D.E. 478.)

the "activities and associations of Frank Langano, a member of the Luc[c]hese Organized Crime Family, prior to his death on April 12, 2007," and to provide "a possible motive for Langano's death, if allegations are pursued and proven." (Sweeney Memo at 1, 20.)

Although the document appears legitimate on its face, it emerged not by way of the thousands of pages of documents the DCJ produced during discovery, but in response to a subpoena the Estate served on Sweeney's widow Charlotte. (D.E. 514-1, Clarke Supp. Cert. ¶¶ 15-18; *see* D.E. 514-2, Charlotte Tr. 32:9-34:4, 132:25-133:11.) Before Sweeney died in July 2011 he had not been questioned under oath about the memorandum, and no DCJ employee or representative has ever authenticated it as a genuine DCJ record. (Clarke Supp. Cert. ¶¶ 5, 18.)

There is evidence that Sweeney may have drafted the document as a counterattack against the DCJ, which he sued for wrongful termination. The origins of that litigation began in or around 2004, when the BCPO was engaged in an investigation of organized crime gambling dubbed "Operation Jersey Boyz." (*Id.* ¶ 20(a).) On October 5, 2004, the BCPO picked up a conversation between Sweeney and a confidential informant on a wiretap that it deemed suspicious. (*See* D.E. 514-3, Clarke Supp. Cert. Ex. B at 8, 14.) The BCPO waited to disclose this conversation to the DCJ until after arrests were made in early December 2004, a decision that the judge who issued the wiretap determined was improper. (*See* D.E. 507-68, Markos Cert. Ex. 64 at 94.) During the course of proceedings before the wiretap judge, Sweeney twice engaged in inappropriate *ex parte* communications: first in January 2006 when he called the judge's chambers to express concern regarding the confidential informant's safety, and again on May 4, 2007 (seven days before the date of the memorandum) when he left a voicemail on the judge's home answering machine to "alert" her that certain sealed documents had purportedly reached the press. This resulted in the judge reporting Sweeney to a DCJ investigator and

3

sending a letter directly to the Attorney General about his misconduct.  (*See* Clarke Supp. Cert. Ex. B at 6-7; *see also* D.E. 514-4 and 514-5, Clarke Supp. Cert. Exs. C, D.)

The DCJ fired Sweeney in 2008 and two years later, he sued the State of New Jersey, the New Jersey Attorney General's Office, the DCJ, and several state officials in state court for wrongful termination, retaliation, intentional infliction of emotional distress, and violations of the New Jersey Racketeer Influenced and Corrupt Organizations Act, N.J.S.A. 2C:41-1, *et seq*. (*See generally* D.E. 507-20, Sweeney Compl.)  Although the lawsuit was voluntarily dismissed upon his death in July 2011, Sweeney's complaint—with the contents of the memorandum front and center—alleged that several DCJ officials knowingly attempted to obstruct his investigation into corruption in the BCPO.  (*See* Sweeney Compl. ¶¶ 22-47, 61-66; *see also* Clarke Supp. Cert. ¶¶ 5, 20.)

### B.  Contents of the Sweeney Memorandum

According to the Sweeney memorandum, Mordaga, who oversaw the BCPO's Jersey Boyz investigation into organized crime, and Lagano, identified as a potential target, were actually friends who attended gatherings at each other's homes and vacationed together in Florida.  (Sweeney Memo at 2; *see* D.E. 497, FPTO Defs. Stmt. ¶¶ 10-13.)  They also entered into business ventures together, including illegal business dealings with a Woodcliff Lake attorney.  (Sweeney Memo at 2-4.)

The memo recites that on December 1, 2004, the BCPO executed search and arrest warrants at Lagano's home.  (*Id.* at 1.)  Lagano was processed and brought to Mordaga's personal office.  (*Id.* at 2.)  According to the memo, Mordaga said he would have to "remove himself from the investigation in order to protect himself and his [and Lagano's] relationship"; gave Lagano an attorney's business card and assured him that "90% of his problems [would] go

4

away"; and revealed that one of Lagano's close friends who had given Lagano $67,000 just prior to his arrest was in fact a DCJ source. (*Id.; see also id.* at 1.)

According to the memo, money and items seized from Lagano's home in the course of the Jersey Boyz investigation had gone missing, and as a result the relationship between Mordaga and Lagano soured. (*Id.* at 2.) Lagano attempted to separate himself from Mordaga and also sought new legal representation. (*Id.* at 2-3.)

Finally, and pertinent to the memo's importance in the within lawsuit, it describes an encounter between Mordaga and Lagano on an unspecified date at an unspecified location when Lagano was having dinner with a builder named Anthony Trobiano. (*Id.* at 3.) Mordaga approached the two and attempted to rekindle his relationship with Lagano, telling him he could get half of the missing money back and that Mordaga could also arrange for Lagano to avoid prison time. (*Id.*) Lagano refused and went to another establishment, but Mordaga followed, making the same offer. (*Id.*) When Lagano refused for a second time, Mordaga stated, "Don't count on Sweeney helping you, he's going to jail." (*Id.*) The Estate argues that Mordaga's "Don't count on Sweeney" comment effectively disclosed Lagano's status as a confidential informant for the DCJ.

Buttressing this interpretation, because the memo itself is noticeably silent as to whether Lagano was in fact an informant, the Estate relies on Sweeney's wrongful termination complaint which, as explained *supra*, reiterates the facts set forth in the memorandum and further alleges that sometime after he was arrested, Lagano became a source for Sweeney and the DCJ. (Sweeney Compl ¶ 37.)

Sweeney's memorandum and wrongful termination complaint are silent as to the date and location of Mordaga's "Don't count on Sweeney" remark. The Estate relies on the following

testimony of Lagano's daughter Corinne, who was deposed in connection with the instant

lawsuit, to fill in the gaps:

> Q: After being introduced to Michael Mordaga at these parties, do you remember ever socializing with him, having discussions with him?
>
> A: No, I – I didn't socialize with him.  My dad socialized with him.
>
> Q: Oh. And what do you mean when you say that?
>
> A: My dad was friends with him, so they socialized.  Dinners.
>
> Q: No, I – well, dinners.  What dinners?
>
> A: **Stony Hill Inn.  They had – they would meet there.  Friends.**
>
> Q: How do you know that?
>
> A: Well, there was a time – **I did the credit card processing for Stony Hill Inn**, and there were many times where I would be called; problems, glitches with the POS system.  **I was there one night, Dad was having dinner with [Anthony Trobiano] and Frank Walsh.  And Mike Mordaga walked up to the table.  I wasn't paying attention too much to – they weren't right next to me; I was behind the bar with the POS system.  But at some point it seemed like voices were raised.  I didn't think that much of it until after the Sweeney complaint and there was, like, information in there that sort of, like, said, "Oh, my goodness, I was there that night**."

(D.E. 507-21, Corinne Tr. 73:16-74:16 (emphasis added).)  Corinne testified that this encounter

occurred the month before her father's murder.  (*Id.* 95:25-96:11.)

When pressed for more information, Corinne admitted that she "wasn't paying very much

attention" and "didn't overhear exact conversation" or the words exchanged among the men,

who were about 20 feet away from her.  (*Id.* 75:23-76:16, 95:18-21, 103:23-104:4.)  Corinne

testified that when she was finished with the POS system, she stopped at the table to say goodbye

to her father, Trobiano, and Walsh, but Mordaga was no longer present.  (*Id.* 104:25:105:3.)  She

did not ask any of the men, either that night or any time after, whether they had an altercation

with Mordaga.  (*Id.* 105:20-106:20.)

The Estate, it appears, asks to present the factfinders with a writing that describes a conversation that the writer, since deceased, was not part of, who says that during the conversation a statement—"Don't count on Sweeney helping you"—was made by one of the persons present; and the Estate has a witness who will testify she saw an encounter among persons some of whom are mentioned in the writing, but she did not hear what the persons were saying.  Assuming admissibility of the statement "Don't count on Sweeney helping you" as uttered by a state law enforcement official in the hearing of members of organized crime, the Estate opposes summary judgment on grounds the statement constitutes evidence of a state-created danger that led to Lagano's execution as an informant.

## III.   Procedural History

On August 29, 2012, the Estate sued defendants and the State of New Jersey for violations of 42 U.S.C. § 1983 and the NJCRA under a state-created danger theory, as well as for fourth amendment violations arising from the Jersey Boyz search.  (D.E. 1.)  The Estate filed an amended complaint on December 10, 2012, which asserted the same causes of action as the original complaint but omitted the State of New Jersey as a defendant.  (D.E. 5, FAC.)  In both iterations of the complaint, the Estate did not allege that Mordaga's "Don't count on Sweeney" comment was the disclosure that caused Lagano's death; instead, it generally blamed the disclosure on the BCPO and alleged that the disclosure occurred at some point *after* Mordaga's "Don't count on Sweeney" comment:

> 30. Mordaga then told [Lagano] not to count on Sweeney helping, because Sweeney is going to jail.
>
> 31. Thus, Mordaga already knew that [Lagano] had become Sweeney's confidential informant.

32. Bergen County Prosecutor's Office personnel **thereafter disclosed to alleged members of traditional Organized Crime families arrested in raids on December 1, 2004 that [Lagano] had been an informant.**

33. On April 12, 2007, in the middle of the afternoon, in front of a diner he co-owned in East Brunswick, New Jersey, [Lagano], then 71 years old, was fatally shot in the head.

(*See* FAC ¶¶ 30-33 (emphasis added).)

Defendants initially prevailed in dispositive motion practice before the district court. Judge Hochberg, the assigned district judge,[2] granted defendants' motions to dismiss on March 22 and June 19, 2013, finding in pertinent part that neither the BCPO nor Mordaga was amenable to suit under Section 1983 and the NJCRA because the BCPO was acting within its authority. She also found that dismissal was appropriate on sovereign and qualified immunity grounds. (*See* D.E. 27, 42.)

However, the Estate successfully appealed and restored its Section 1983 and NJCRA causes of action.[3]  (*See* D.E. 46, 47.)  Now proceeding before Judge Arleo, defendants filed a renewed motion to dismiss on January 29, 2016.  (D.E. 54.)  On March 22, 2016, Judge Arleo held oral argument on the motion, during which she expressed her reluctance to dismiss the Section 1983 and NJCRA causes of action on immunity grounds.  (D.E. 499-7, 3/22/16 Tr. 8:16-9:2, 12:13-21, 14:16-15:5.)  As for the merits, however, Judge Arleo recognized that the Estate appeared to be "shifting" its state-created danger theory from an intentional disclosure to a disclosure sounding in negligence—*i.e.*, the "Don't count on Sweeney" comment.  (*See id.*

---

[2] The undersigned has been assigned to this case since June 14, 2017.  (D.E. 191.)

[3] Judge Hochberg dismissed the Estate's fourth amendment cause of action as untimely, which was upheld on appeal.

19:21-20:4.)  When she pressed the Estate for its theory of the case, counsel responded as

follows:

> [THE ESTATE]: Well, Judge, we are engaged in an intentional misconduct case, a corruption case.  We're not going to divorce ourselves from facts that came out through the Sweeney case.  What was indicated in Sweeney's amended complaint, which was referred to by the 3rd Circuit, also includes that the meeting was basically set up by Mordaga.  So as we move along in discovery, we're certainly going to search through everything in every way that we get to intentional misconduct.  So it wouldn't be one particular act.

> THE COURT: **But if your theory is that Mordaga made the comment about, you know, Sweeney's going to jail, too, at the restaurant with the mutual acquaintance, and he shouldn't have – it was negligence to disclose that in front of the mutual acquaintance, who then went and told organized crime, that's not intentional on behalf of Mordaga**, and if you have two competing theories, well, that's how it happened, it also happened because the BCPO personnel also intentionally disclosed it, then you're going to have a causation issue.

> . . .

> [DEFENSE]: It makes it quite difficult for me, Your Honor, to argue.

> THE COURT: I know.

> [DEFENSE]: It's continually changing.

> THE COURT: It's not changing anymore.  **If at the end of the day this is a negligence case, you'll get summary judgment.  Okay?**

(*Id.* 20:9-21:4, 22:22-23:3 (emphasis added).)

Accordingly, Judge Arleo denied defendants' motion to dismiss but granted the Estate

leave to amend its complaint to explicitly allege an intentional disclosure as follows:

> 30. Mordaga then told [Lagano] not to count on Sweeney helping, because Sweeney is going to jail.

> 31. Thus, Mordaga already knew that [Lagano] had become Sweeney's confidential informant.

32. Bergen County Prosecutor's Office personnel <u>and Michael Mordaga</u> thereafter <u>intentionally</u> disclosed to alleged members of traditional Organized Crime families arrested in raids on December 1, 2004 that [Lagano] had been an informant.

(D.E. 66, SAC ¶¶ 30-32; *see* D.E. 63.)

Over the next several years, the parties participated in fact discovery under the supervision of the assigned magistrate judges.  In 2020, the parties engaged in discovery-related motion practice which included, *inter alia*, the estate's unsuccessful motion before Magistrate Judge Waldor for an extension of the March 31, 2020 fact-discovery deadline.  (*See* D.E. 395, 401, 405, 415, 430, 448.)  The estate unsuccessfully appealed Judge Waldor's denial to this Court (*see* D.E. 434, 449, 478, 479), and defendants' motions for summary judgment (D.E. 499, 502) followed.

## IV.    Standard of Review

Fed. R. Civ. P. 56(a) provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" such that the movant is "entitled to judgment as a matter of law."  In ruling on the motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all inferences in favor of that party. *Auto-Owners Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 402 (3d Cir. 2016).  The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (quoting *D.E. v. Central Dauphin School Dist.*, 765 F.3d 260, 268-69 (3d Cir. 2014)).  A "genuine" dispute of "material" fact exists where a reasonable juror's review of the evidence could result in "a verdict for the nonmoving party" or where such fact might otherwise affect the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Disputes over irrelevant or

unnecessary facts, however, fail to preclude the entry of summary judgment." *Diversified Indus., Inc. v. Vinyl Trends, Inc.*, 2016 WL 6897783, at *3 (D.N.J. Nov. 22, 2016) (Simandle, J.).

## V.   Discussion

Defendants' motions for summary judgment raise two main arguments: *first*, defendants are entitled to judgment as a matter of law because the Estate has failed to present sufficient evidence to support its state-created danger claims; and *second*, even if the evidence of record presents a triable issue, the Court should nonetheless grant their motions on immunity grounds. (*See* D.E. 499-1, Mordaga Mov. Br. at 7-13; *see also* D.E. 502-1, BCPO Mov. Br. at 6-12.)  In opposition, the Estate argues that there is sufficient evidence in the record to demonstrate that: (i) Mordaga made the "Don't count on Sweeney" comment; (ii) he did so with the intention of bringing about Lagano's death; and (iii) the comment in fact led to his death.  (D.E. 507, Opp. Br. at 7-14.)  The Estate further urges the Court to find that neither the BCPO nor Mordaga is entitled to immunity.  (*See id.* at 14-19.)

### A.   State-Created Danger Claims

The Court begins by analyzing the sufficiency of the Estate's 42 U.S.C. § 1983 and NJCRA state-created danger claims, both of which are analyzed through the lens of Section 1983 and its progeny.  *See Szemple v. Corr. Med. Servs., Inc.*, 493 F. App'x 238, 241 (3d Cir. 2012) ("The NJCRA is interpreted as analogous to § 1983."); *accord Est. of Martin v. U.S. Marshals Serv. Agents*, 649 F. App'x 239, 245 n. 4 (3d Cir. 2016).

The Due Process Clause of the Fourteenth Amendment "protects individuals against arbitrary government action."  *Kedra v. Schroeter*, 876 F.3d 424, 436 (3d Cir. 2017).  Although the Due Process Clause "does not impose an affirmative obligation on the state to protect its citizens[,] . . . [t]he state-created danger theory operates as an exception to that general rule."

*Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008).  To assert a state-created danger claim, a plaintiff must satisfy the following four elements:

> (1) the harm caused was foreseeable and fairly direct; (2) the state official "acted with a degree of culpability that shocks the conscience"; (3) the state and the plaintiff had a relationship such that "the plaintiff was a foreseeable victim of the defendant's acts"; and (4) the official affirmatively used his authority "in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger" than had he never acted.

*Kedra*, 876 F.3d at 436 (quoting *Bright v. Westmoreland Cty.*, 443 F.3d 276, 281 (3d Cir. 2006)).

As a preliminary matter, defendants argue that the Estate cannot assert a state-created danger claim because there is no admissible evidence to suggest that any disclosure ever occurred.  That argument has merit.  Despite years of discovery,[4] the Estate has failed to uncover any disclosures other than Mordaga's "Don't count on Sweeney" comment—which, as explained *supra*, was referenced in the Estate's complaints but *not* as the disclosure that allegedly caused Lagano's murder.  Additionally, the Estate has demonstrable proof problems about whether Mordaga ever uttered those words.  Of the four people allegedly in earshot of the "Don't count on Sweeney" comment, two (Lagano and Walsh) are deceased and the two living witnesses (Mordaga and Trobiano) have both denied under oath that the comment was ever made.  (*See* D.E. 499-6, Mordaga Tr. 205:23-206:8, 208:10-15; *see also* D.E. 499-5, Trobiano Tr. 14:13-18.) Sweeney is the only source for the statement and its context.  Although Corinne Lagano testified

---

[4] The Estate seeks to relitigate the discovery-related motions decided by Judge Waldor and affirmed by this Court in November 2021, arguing that it has been "prevented from obtaining important, relevant discovery."  (Opp. Br. at 5.)  Contrary to the Estate's assertion in its opposition brief, the Court already considered "the substantive implications" of Judge Waldor's decisions in its November 2021 opinion and will not revisit them here.  (*Id.*; *see* D.E. 478.)

Notwithstanding, the Estate's argument that it was precluded from obtaining discovery which would "support[] the inference that Lagano was an informant before his death" is unpersuasive. (*See* Opp. Br. at 12-13.)  As will become apparent, the key inquiry is not whether Lagano was actually an informant but, rather, whether Mordaga's alleged disclosure caused Lagano's death.

that she recalled an interaction among the men at Stony Hill Inn restaurant, she admitted that she "didn't overhear exact conversation" or the words exchanged.[5]  (*See* Corinne Tr. 75:23-76:16.) Finally, even crediting the comment and its context, Sweeney offered it only as a "possible" motive for Lagano's murder.  (Sweeney Memo at 20.)

Unsurprisingly, the parties sharply dispute the admissibility of the Sweeney memorandum, with defendants urging the Court to disregard it as inadmissible hearsay. However, the Court need not make evidentiary rulings because regardless of whether the memorandum is admissible, the Estate cannot establish a key element of its state-created danger claim: causation.

The fourth element of the state-created danger test asks whether the defendant exercised his authority to create a foreseeably dangerous condition.  In order to establish this element, the plaintiff must demonstrate both "a specific and deliberate exercise of state authority" and "a direct causal relationship between the affirmative act of the state and plaintiff's harm." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 432 (3d Cir. 2006).  As such, "the fourth element is satisfied where the state's action was the 'but for cause' of the danger faced by the plaintiff." *Id.*; *see Est. of Smith v. Marasco*, 318 F.3d 497, 510 (3d Cir. 2003) (fourth element is satisfied if "but for the defendants' actions, the plaintiff would have been in a less harmful position").

The Sweeney memorandum sets forth one affirmative act on behalf of Mordaga—the "Don't count on Sweeney" comment.  However, it fails to establish that Mordaga's comment was the "but for" cause of Lagano's death.  Although the first four pages of the Sweeney

---

[5] The Estate also argues that the deposition testimony of DCJ Deputy Chief Michael Tarantino corroborates the "Don't count on Sweeney" comment.  (*See* Opp. Br. at 9.)  According to Tarantino, Sweeney told him that "Mordaga once said that he [Sweeney] should go to jail." (*See* D.E. 507-22, Tarantino Tr. at 148:2-3.)  However, "once said" is hardly a foundation or corroboration.

memorandum are focused on Lagano's Jersey Boyz arrest and the alleged questionable relationship between Lagano and Mordaga, the next 15 pages are devoted to the transcript of a recorded telephone conversation between Lagano's son, Frank Jr., and the attorney with whom Lagano and Mordaga allegedly engaged in corrupt business dealings.[6] (*See* Sweeney Memo at 4-19.) The transcript is telling—putting aside the fact that Mordaga's name is noticeably absent, it provides a glimpse of what Mordaga describes in his reply brief as the "dubious business dealings" of Lagano and his organized crime associates. (*See* D.E. 514, Mordaga Reply Br. at 5).

The transcript reveals that Lagano was tangled in a web of questionable business dealings and partners prior to his death, which made him inherently vulnerable to danger. It also brings into focus several possible suspects and motives for Lagano's murder. (*See* Sweeney Memo at 13, 15.) After all, that was the stated purpose of the Sweeney memorandum—to "provide[] a possible motive for Langano's [sic] death, if allegations are pursued and proven." (*Id.* at 20.) More than anything else, that stated purpose puts an end to the Estate's contentions here: "a

---

[6] It is worth noting that the Sweeney memorandum misconstrues the circumstances that led to the recorded conversation. According to the memorandum, Frank Jr. was notified about a problem with a check the attorney wrote to Lagano and so he decided to "telephone[] [him] and record[] the conversation." (Sweeney Memo at 4.) That explanation was refuted by Frank Jr., who testified at deposition that he recorded the conversation at Sweeney's request with a cassette and recording device provided by Sweeney:

> [Sweeney r]ang the doorbell, showed me his badge, said he worked for the Attorney General's office and was investigating my father's murder. He did not give me any details, but I don't know if he possibly did. I was in shock at this point in time. I was possibly on Valium. I mean, I don't – it really is a blur. There was a lot going on at that point in time. **I do remember him giving me a cassette and telling me to record something, but I don't remember the specific details, what he said before the recording, during the recording, and I just know that he took the recording tape from me and I did not hear back from him.**

(*See* D.E. 514-6, Lagano Tr. 78:7-21 (emphasis added); *see also id.* 78:22-79:3.)

possible motive" *if* "allegations are pursued and proven" is not a proper basis for unspooling the narrative the Estate seeks to put before a jury.

Adding further confusion to the mix, the Sweeney memorandum omits several key details regarding the "Don't count on Sweeney" comment that are central to causation, including when it was said and who was there. The memorandum provides neither a date nor time for the Lagano-Mordaga encounter, and instead broadly states that it occurred "[s]hortly after [Lagano's] self imposed separation" from Mordaga. (*See* Sweeney Memo at 3). And although the memorandum indicates that Lagano was dining with Trobiano on the evening in question, it provides that "Lagano left the restaurant and went to another establishment," which is where Mordaga told him not to "count on Sweeney." (*Id.*) Nowhere in the memorandum does it state that Trobiano went with Lagano to the second establishment; nor does it clarify whether anyone other than Lagano was present when the "Don't count on Sweeney" comment was made.

Even if the Court were to assume that Trobiano heard Mordaga's comment, the record is devoid of evidence demonstrating that Trobiano is or ever was a member of organized crime. In the memorandum, Sweeney did not shy away from identifying Lagano and others as members or associates of organized crime families, yet attributed no such label to Trobiano, describing him only as "a builder." (*See id.; see also id.* at 1-2.) In apparent recognition of the lack of evidence connecting Trobiano to organized crime, the Estate backs away from its original assertion that the disclosure was made to "members" of organized crime who had been arrested in connection with the Jersey Boyz investigation, and instead identifies Trobiano as someone who is merely "associated" with organized crime. (*See* Opp. Br. at 3.) The problem with that watered-down

characterization—aside from the lack of solid evidence to support it[7]—is that it further ruptures the causal chain of events leading to Lagano's death.

The Court has reviewed Third Circuit jurisprudence on the issue of causation in the state-created danger context. In *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996), a young woman, Samantha Kneipp, and her husband were returning home from a night of drinking at a local tavern. Kneipp was visibly intoxicated and, at times, unable to walk without her husband's assistance. Shortly after midnight, when the couple was less than a block away from their home, police officers stopped them for "causing a disturbance on the highway." *Id.* at 1201. At some point the officers allowed the husband to go back home to relieve the babysitter; afterwards, they let Kneipp walk home by herself, even though she was visibly drunk. At approximately 2:00 a.m., she was found unconscious at the bottom of an embankment, suffering from hypothermia. This ultimately led to permanent brain damage.

Kneipp's legal guardians asserted a state-created danger claim against the city of Philadelphia and the officers at the scene. The district court granted summary judgment in the defendants' favor but the Third Circuit reversed, reasoning that "[i]t is conceivable that, but for the intervention of the police, [Kneipp's husband] would have continued to escort his wife to their apartment where she would have been safe." *Id.* at 1209. Because Kneipp was left to

---

[7] The Estate relies on Trobiano's deposition transcript in which he admitted to knowing two alleged members of organized crime, one who married a close childhood friend of his wife and another who passed away but once had a "woman friend living in the same building that [Trobiano] lived in." (*See* Trobiano Tr. 145:23-147:6, 148:15-25.) The Estate also claims that Trobiano lied about knowing two other alleged organized crime members and relies on the handwritten notes of Lagano's attorney, which appear to indicate that Lagano, Trobiano, and Walsh once "ran into" one of those organized crime members who then "introduce[d]" them to the other. (*See* D.E. 507-13, Markos Cert. Ex. 9 at 3.)

continue home unescorted, she "was in a worse position after the police intervened than she would have been if they had not done so." *Id.*

The next year, the Third Circuit revisited the causation issue in *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902 (3d Cir. 1997). There, Diane Morse, a teacher at a child-care center, was shot and killed by a local resident with a history of mental illness who entered the building through an unlocked rear entrance. In the weeks preceding the shooting, the school district had permitted contractors to leave the rear door open so they could work in the building, despite a district policy requiring the door to be locked at all times. Morse's estate sued the school district and argued that its actions constituted a state-created danger, which the district court rejected at the motion to dismiss stage. In affirming the district court, the Third Circuit accepted as true the estate's allegation that the shooter gained access to the building through the unlocked rear door. However, it found that "[t]he causation, if any, [was] too attenuated" to establish a state-created danger claim because the estate could "prove no set of facts which w[ould] provide the direct causal connection between [the] deadly attack and any of defendants' allegedly improper acts." *Id.* at 909. The Third Circuit distinguished *Kneipp* on grounds that it "involved a visibly inebriated and incapacitated woman who was left alone on the road by police" and found injured shortly after. *Id.* Unlike the police's actions in *Kneipp*, it could not be said that the school district's actions "directly caused the attack" on Morse. *Id.* at 910.

Nearly a decade later, in *Kaucher v. Cnty. of Bucks*, 455 F.3d 418 (3d Cir. 2006), a corrections officer at Bucks County Correctional Facility and his wife sued Bucks County and several employees responsible for the facility's operation. The Kauchers alleged that they contracted Methicillin Resistant Staphylococcus aureus ("MRSA") infections as a result of unsanitary and dangerous conditions at the facility, and contended that the defendants acted with

"deliberate indifference in providing false and misleading information regarding the dangers of MRSA, and in covering up the extent of the problem." *Id.* at 429.  The Kauchers relied on a memorandum authored by the defendants at the beginning stages of the MRSA outbreak, which summarized the MRSA situation at the facility and warned inmates and staff to take precautions. The memorandum also indicated that there were no known cases.  The district court granted summary judgment in favor of the defendants and the Third Circuit affirmed, reasoning in pertinent part that "[t]here had always been cases of staph infections at the jail, including MRSA infections, and there had always been a corresponding risk of infection to inmates and corrections officers." *Id.* at 434.  The court found that in the absence of the memorandum "the dangers [to the Kauchers] would have been the same," and therefore causation was lacking. *Id.* at 435.

The events as alleged in the Sweeney memorandum are far closer to those present in *Morse* and *Kaucher* than in *Kneipp*.  Lagano was playing a dangerous game long before the alleged "Don't count on Sweeney" comment, having surrounded himself with "mobbed up partners" and questionable business associates.  (*See* Sweeney Memo at 13, 15.)  Further, while *Kneipp* had a tight timeline of undisputed events involving a finite list of actors, the Sweeney memorandum provides just the opposite—a comment uttered by Mordaga at an undisclosed time and place, leaving to interpretation both the import of the remark itself, and whether anyone other than Lagano himself heard it.  In short, the Sweeney memorandum could possibly provide a potential link between Mordaga's comment and Lagano's murder, but that link is far too attenuated to establish what is required for a state-created danger claim—a "direct causal connection" between the comment and the murder.  *See Morse*, 132 F.3d at 909.

The Estate appears to argue that the Court can fill in the gaps left by the Sweeney memorandum with Corinne Lagano's deposition testimony.  (*See* Opp. Br. at 8.)  That argument is misguided.  As a preliminary matter, Corinne repeatedly testified that she did not hear any of the words exchanged between her father and Mordaga, so she cannot corroborate the disclosure central to the Estate's claims.  Moreover, her version of events conflicts with Sweeney's.  For example, while Corinne testified that the encounter she witnessed occurred in March 2007, Sweeney claims that it occurred "[s]hortly after" the events that led to Lagano's self-imposed separation from Mordaga—namely, when Lagano discovered that money and items seized during the Jersey Boyz search were missing.  (*See* Sweeney Memo at 2-3.)  That search occurred on December 1, 2004, more than two years before Corinne's estimated date.  Perhaps more importantly, Corinne's version of events adds Frank Walsh to the mix of individuals present for the "Don't count on Sweeney" comment, an individual whom Sweeney described in another memorandum as a "Bonanno Family associate recently released from federal custody."  (*See* D.E. 507-24, Markos Cert. Ex. 20 at 5 (February 8, 2005 memorandum outlining BCPO corruption).)  That Walsh's name is absent from a memorandum which purports to "provide[] a possible motive" for Lagano's death—and which explicitly connects several individuals to organized crime—further casts doubt on the probative value of Corinne's testimony.  (*See* Sweeney Memo at 20.)

In light of the foregoing, the Estate has failed to demonstrate that a genuine issue exists as to an essential element of its state-created danger claim—namely, that Mordaga's comment

was the cause of Lagano's death.  Accordingly, summary judgment must be entered in defendants' favor.[8]

* * *

Although the Estate's failure to establish causation ends the inquiry, the Court would be remiss if it failed to mention that just over seven years ago, Judge Arleo forecasted entry of summary judgment in defendants' favor if the Estate were to rely on "Don't count on Sweeney" comment, opining that such a disclosure was more akin to "negligence" than an "intentional [act] on behalf of Mordaga."  (*See* 3/22/16 Tr. 20:10-25, 22:22-23:3.)  Mordaga urges the Court to construe Judge Arleo's statement as "the law of the case" and to find that the Estate has failed to establish the second element of a state-created danger claim—namely, "conscience shocking" conduct.  (Mordaga Mov. Br. at 9-10.)  In opposition, the Estate argues that Mordaga's argument is an "overreach" and contends that the record is ripe with evidence indicative of Mordaga's motive to have Lagano killed.  (Opp. Br. at 3, 11-12, 14.)

The Court need not address the parties' competing "law of the case" arguments, though it bears mentioning that Judge Arleo was properly concerned about the wobbly basis for the Estate's claims.  For that reason, she was very direct in telling the attorneys that "[the Estate's theory is] not changing anymore.  If at the end of the day this is a negligence case, you'll get summary judgment.  Okay?".  (*See* 3/22/16 Tr. 23:1-3.)  This Court is satisfied that we have come to "the end of the day."  In all three iterations of the complaint, the Estate used Mordaga's "Don't count on Sweeney" comment to demonstrate only that Mordaga believed Lagano to be a confidential informant for the DCJ and/or Sweeney.  The Estate alleged that Lagano was outed—

---

[8] The remaining issues in dispute—including whether defendants are entitled to immunity—are therefore immaterial to the outcome of this case.

specifically, to "members of traditional organized Crime families" who had also been arrested in connection with the Jersey Boyz investigation—at some point *after* Mordaga made the comment. (*See, e.g.*, SAC ¶¶ 30-32.)

In apparent recognition of the fact that discovery produced no further evidence of the described disclosure—and that the only third-party witness to the "Don't count on Sweeney" comment in the Sweeney memorandum, Trobiano, was not a member of organized crime, let alone arrested in connection with the Jersey Boyz investigation—the Estate has now changed course.  It now urges that the "Don't count on Sweeney" comment caused Lagano's execution, and further that the comment was made to individuals who were "associated with" organized crime.  Whether viewed as a Hail Mary shot at the buzzer, or an effort born out of grief and frustration to lay blame somewhere for Lagano's unsolved murder, the Estate's arguments as discussed at significant length above do not have merit.

## VI.    Conclusion

Because the Estate has failed to satisfy the essential elements of a state-created danger claim, defendants are entitled to summary judgment and an appropriate order will be entered.


                                        /s/ Katharine S. Hayden
Date: March 24, 2023                    Katharine S. Hayden, U.S.D.J.